## Wytheville.

POCAHONTAS COLLERIES CO. V. RUKAS' ADMINISTRATOR.

June 28, 1905.

1. DECLARATIONS—*Numerous Counts—Bill of Particulars.*—A plaintiff may, in different counts of his declaration, allege any number of distinct acts of negligence on the part of a defendant, and the defendant may guard against surprise by calling for a bill of particulars, under Sec. 3249 of the Code, which will be granted in a proper case.
2. DEATH BY WRONGFUL ACT—*Aliens—Right to Sue.*—Resident alien friends are entitled to the benefits and remedies afforded by sections 2902 and 2904 of the Code, giving a right of action for death by wrongful act or neglect. The policy of·our laws is to extend rather than abridge the liberal policy of·the common law under which an alien friend may sue and be impleaded to the same extent as a citizen.
3. DEATH BY WRONGFUL ACT—*Elements of Damage.*—This court adheres to its former rulings as to the elements of damage which the jury may consider in assessing damages for death occasioned by the wrongful act or neglect of another, and which are embodied in instruction No. 3 given for the plaintiff in this cause.
4. MASTER AND SERVANT—*Safe Place—Special Damages—Fire in Adjoining Mine.*—It is the duty of a mining company to give notice to a miner who is ignorant of the fact of the existence of a fire in an adjoining mine, on a lower level, and connected by cross-cuts with the mine in which he is about to enter, and of which the company has notice. In the case at bar the company knew, or, in the exercise of ordinary care, ought to have known of the dangerous consequences likely to result from such a fire; and if it failed to give such notice it is liable for resulting injuries to the miner. It is the duty of the master to give warning to his servants of all perils to which they will be exposed of which he is, or ought to be, aware, other than such as they should, in the exercise of ordinary care, have foreseen, as necessarily incident to the business, in the natural and ordinary course of affairs.

Error to a judgment of the Circuit Court of Tazewell county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

The following are the instructions given for the plaintiff, and referred to in the opinion of the court:

### Instruction No. 1.

"The court instructs the jury that it is the duty of an employer to use ordinary care to provide a reasonably safe place in which his employee may perform the service required of him, and to use like care to keep the place reasonable safe so that the employee may not be exposed to unnecessary and unreasonable risks, and the employer is liable for an injury to the employee of which the proximate cause is the failure to exercise this care. .

"The care and diligence required of the master in the sense of the rule above laid down, is such as a reasonably prudent man would exercise under like circumstances, to protect his servant from injury, having in view the character of the service required, and the dangers, if any, to be apprehended by a reasonably prudent man in the exercise of ordinary diligence, and extends to every portion of the place in which the employer's business in conducted, from which danger is reasonably likely to result to the employee's injury, unless ordinary care is used for his reasonable safety."

### Instruction No. 2.

"If the jury shall believe from the evidence that changes occurred in the character of the condition of the Baby Mine of the defendant company which rendered it reasonably probable that the safety of the West Mine in which the plain-

tiff's intestate worked would be dangerously affected thereby, and that injury or death to plaintiff's intestate would likely result therefrom as a reasonable and probable consequence, and if the jury further believe from the evidence that the defendant company knew, or in the exercise of ordinary care and judgment ought to have known, these facts in time to have warned plaintiff's intestate of such danger, then it was the duty of the defendant company to have used reasonable care and diligence to warn the plaintiff's intestate of the danger or to have taken other reasonable precautions to protect him from the danger; and if the jury should further believe from the evidence that the defendant company failed to discharge its duty as above set forth and that its failure so to do resulted in the death of plaintiff's intestate as a proximate cause, then the plaintiff is entitled to recover in this action, provided the jury should further believe from the evidence that plaintiff's intestate himself exercised ordinary care and judgment under all the circumstances surrounding him.

"And the court instructs the jury in this connection that the duty of the employer to warn his employee exists only where there are dangers the employer knows of, or ought by the exercise of ordinary care and judgment to know of, and which he has reasonable grounds to believe that his employee does not know of, or could not discover in time to protect himself from injury, by the use of ordinary care and prudence."

### Instruction No. 3.

"If you believe that the plaintiff is entitled to recover in this case under the law and the evidence, then in ascertaining the damages of the plaintiff you may consider:

"First: The pecuniary loss sustained by the widow and infant children of Anton Rukas, by his death, fixing the same at such sum as would be equal to the probable earnings of the said Anton Rukas taking into consideration the age, business capacity, experience, and health of the deceased, during what would probably have been his lifetime had he not been killed.

"Second: By adding thereto compensation for the loss of his care, attention and society to his widow and children.

"Third: By adding such further sum as you may deem fair and just by way of solace and comfort to his said wife and children for the sorrow, suffering and mental anguish occasioned to them by his death."

### Instruction No. 4.

"The court instructs the jury that if the defendant company relies upon contributory negligence of plaintiff's intestate to defeat a recovery in this case, then you are instructed that the burden is upon the defendant to establish such contributory negligence, unless you should believe that such contributory negligence appears from the evidence of the plaintiff in this case."

*J. H. Fulton* and *Rucker, Anderson & Hughes,* for the plaintiff in error.

*Chapman & Gillespie* and *J. H. Stuart,* for the defendant in error.

Whittle, J., delivered the opinion of the court.

This action was brought to recover damages for the death of plaintiff's intestate, Anton Rukas, which is imputed to the negligence of the defendant.

On the morning of November 14, 1901, Rukas, while at work as a collier in the service of the defendant, in one of its mines located near the town of Pocahontas, was overcome and suffocated by smoke and gases generated from fire in an adjoining mine, and conveyed into the mine in which he was employed through connecting galleries.

There was a verdict and judgment for plaintiff, and the defendant brings error.

The first assignment of error relates to the action of the court in overruling the demurrer to the declaration, the objection being that it charges various grounds of negligence, to each of which the accident is proximately ascribed, thus leaving the defendant unapprised of the particular act of negligence which it is called upon to answer.

This objection affords no sufficient grounds for demurrer. It is permissible under the practice in this jurisdiction for the plaintiff to allege any number of distinct acts of negligence, and the defendant may guard against surprise by resort to the provisions of section 3249 of Va. Code, 1904, which, in a proper case, entitles him to demand a more specific statement of the real ground of complaint. *City of Richmond* v. *Leaker,* 99 Va. 1, 37 S. E. 348; *Wood* v. *Am. Natl. Bank,* 100 Va. 306, 40 S. E. 931.

The second assignment of error involves the ruling of the court in sustaining the motion of the plaintiff to reject a plea of the defendant, which denies the right of the personal representative of a non-resident alien to maintain an action for his death under section 2902 of the Code.

At common law, an alien domiciled in a country is entitled to the protection of its laws, and in return therefor owes temporary allegiance to the country of his adoption during the period of his residence. He is subject to the law, as well as entitled to its protection, and is liable to be tried and punished for crime; and may sue and be impleaded in the proper courts to the same extent as a citizen. The general doctrine is stated thus: "While the rights of aliens depend entirely upon the municipal law of the State or nation, or the rights which are given aliens by international law, in the United States, except as to certain political and municipal rights to which citizens only are entitled, resident alien friends have practically all and the same rights and privileges as citizens. These rights and privileges include both personal rights—such as the right to dwell safely in the country, and the right of protection to person, reputation and other relative rights—and property rights." 2 Cyc. 89, and authorities cited.

In the same volume, at page 108, it is said: "So also, it has been held that an alien might maintain an action for statutory damages or penalty for death by wrongful act." Many of the cases bearing on that question are there referred to.

Alien friends are included in our statute of descents, and by section 43 of the Code, are permitted to acquire by purchase or descent, and hold and transmit real estate in the same manner and to the same extent as a citizen. These statutes indicate an intention on the part of the Legislature to extend rather than abridge the liberal policy of the common law with respect to aliens.

An examination of the authorities relied on to sustain the overruled plea shows that the decisions are controlled by the status of the parties entitled to the recovery in an action for death by wrongful act, rather than by that of the decedent in his lifetime. The distinction is sharply drawn between the rights of *non-resident* and of *resident relations* of the deceased.

Thus, in the leading case of *McMillan* v. *Spider Lake, &c., Co.,* 115 Wis. 332, 91 N. W. 979, 60 L. R. A. 589, 95 Am. St. 947, it is held that non-resident alien relations of the deceased are not entitled to the benefits of the Wisconsin statute giving a right of action in such case. This case reviews the authorities, English and American, on the subject, and in all of them the above mentioned distinction seems to be observed.

So also, in the case of *Deni* v. *Penn. R. R. Co.,* 181 Pa. St. 525, 37 Atl. 558, 59 Am. St. 676, a case much relied on by the defendant, it is said that "a non-resident alien mother has no standing to maintain an action against a citizen of Pennsylvania to recover damages for the death of her son." The opinion proceeds: "Our statute was not intended to confer upon non-resident aliens rights of action not conceded to them or to us by their own country, or to put burdens on our own citizens to be discharged for their benefit. It has no extra-territorial force, and the plaintiff is not within the provisions of it. While it is possible that the language of the statute may admit of a

construction which would include non-resident alien husbands, widows, children and parents of the deceased, it is a construction so obviously opposed to the spirit of the statute that we cannot adopt it."

The weight of authority in this country, however, maintains the right even of non-resident alien relatives of the deceased to receive the benefit of these statutes.

In the case of *Mulhall* v. *Fallows,* 179 Mass. 266, 57 N. E. 386, 54 L. R. A. 934, 79 Am. St. 309, Holmes, C. J., in delivering the opinion of the court, observes: "One or two cases may be found where a general grant of a right of action for wrongfully causing death has been held to confer no rights upon non-resident aliens. *Deni* v. *Pennsylvania R. R. Co.,* 181 Pa. St. 525 (*supra*); *Brannigan* v. *Union Gold Mine Co.,* 93 Fed. 164. But compare *Knight* v. *West Jersey R. R. Co.,* 108 Pa. St. 250, 56 Am. Rep. 200. On the other hand, in several states the right of the non-resident to sue is treated as too clear to need extended argument. *Philpott* v. *Missouri Pac. R. R. Co.,* 85 Mo. 164; *Chesapeake, &c., R. R. Co.* v. *Higgins,* 85 Tenn. 620, 4 S. W. 47; *Augusta Ry. Co.* v. *Glover,* 92 Ga. 132, 18 S. E. 406; *Luke* v. *Calhoun County,* 52 Ala. 115. . . . In all cases the statute has the interest of the employees in mind. It is on their account that an action is given to the widow or next of kin. . . . We cannot think that workmen were intended to be less protected if their mothers happen to live abroad . . . In view of the very large amount of foreign labor employed in this State, we cannot believe that so large an exception was silently left to be read in." See to the same effect *Kellyville Coal Co.* v. *Petratti*s, 195 Ill. 215, 63 N. E. 94, 88 Am. St. 191.

None of these cases question the right of resident aliens (by which is meant aliens domiciled in the United States in contradistinction to those residing in foreign countries) to the benefit of these statutes.

In this case, if the averments of the plea were sufficient

to present the issue intended to be raised, the evidence shows that the widow and one of the children of the deceased reside in the State of West Virginia. The question, therefore, of the right of a non-resident alien to maintain this action does not arise, and upon that question no opinion need be expressed. But the right of a resident alien to the benefits and remedies afforded by sections 2902 and 2904 of Va. Code, 1904, is sustained by authority, and is in accordance with sound policy and justice, and this court has no hesitancy in upholding it in the present case.

The third assignment of error is in respect to the ruling of the court in giving the four instructions asked for by the plaintiff.

These instruction enunciate no new principles, they correctly propound the plaintiff's theory of the case, and there was evidence tending to sustain them. Upon familiar principles, therefore, they were properly given.

With regard to the instruction as to what constitute proper elements of damage in this class of cases, it is conceded that the instruction conforms to the decisions of this court, but a different rule is invoked as being, it is alleged, more in harmony with the weight of authority in other States.

It is sufficient to say that the court has recently had occasion to consider that question, and no sufficient reason is perceived to justify a departure from its own precedents. *Portsmouth St. R. Co.* v. *Peed's Admr.*, 102 Va. 662, 47 S. E. 850.

The instructions given by the court, as a whole, correctly and fairly submitted the law of the case to the jury, and a more detailed notice of them would be unprofitable.

The *gravamen* of the charge in the third count of the declaration, the one that presents the controlling issue in this case, was the negligent failure of the defendant, on the morning of the accident, to notify plaintiff's intestate, that connecting mines with the one in which he was accustomed to work were on fire, and of the consequent danger of entering that mine. The significance of that allegation will be appreciated in con-

sidering the fourth and last assignment of error, namely: the action of the court in overruling the motion of the defendant to set aside the verdict of the jury on the ground that it was contrary to the law and the evidence.

The salient facts, which for the purposes of this appeal must be taken as true, are as follows: In November, 1901, and for a number of years prior thereto, the defendant operated extensive coal mines in the vicinity of Pocahontas. The mines particalarly referred to in the record are, the New Baby mine, the Old Baby mine, and the West mine, lying parallel and contiguous to each other, and in the order named. The territory occupied by these mines is three miles in length, and a mile and a half in width, and embraces a surface area of 3,000 acres. The map exhibited with the record discloses a perplexing labyrinth of entries, cross-entries, air courses, and traveling ways, some of which are several miles in length, and extend entirely through the mountain. These passages are ventilated by two suction fans, located respectively near the mouths of the fan entries of the New Baby mine, and the West mine. The New Baby mine is located about half a mile from the town of Pocahontas; and the distances from the drift-mouth of that mine to the drift-mouth of the West mine is between a half and three-quarters of a mile. The Old Baby mine had been abandoned and its main passageway, for the distance of nine hundred feet, is used as the approach to the New Baby mine; the passageway to the former near the junction of the two mines was closed with a wooden brattice, which separated the old mine from the new.

On November 14, 1901, at three o'clock in the morning, a fire was descovered in the fan of the New Baby mine, which was extinguished in about one hour, but the fan was disabled and not operated again that day. About four o'clock, a large fire was discovered in a pile of coal at the junction of the Old Baby mine and the New Baby mine; and three other fires were also found burning in the courses leading to the burnt fan. At five o'clock there was an explosion in the burning mine, which

destroyed the brattice referred to, and afforded an outlet for the gases and smoke into the Old Baby mine, whence they were carried through cross-cuts to the high levels of the West mine. The origin of these fires is unknown, nor is it material in the view which the court takes of the case.

It was a rule of the company to issue checks to its employees every morning from a check office located near the Baby mine. These checks were slips of paper with which the miners tagged loaded coal cars so that each might receive credit for the number of car loads of coal to which he was entitled.

On the morning of the accident, plaintiff's intestate, with his brother and a miner named Sprengoski, set out from their home in Pocahontas to go to their place of work, at about twenty minutes to six o'clock; and having received their checks, at the usual hour, about 6:15 o'clock, entered the West mine at the main entrance. After proceeding some distance in the mine, they discovered smoke, but Sprengoski, who was an experienced miner, was unable to determine whether it came from the local— a small steam engine used in hauling coal cars in and out of the mine—or from the adjoining mine.

Shortly after these men had gone in to their work, one of the company's mining engineers, who had been ordered by the superintendent to ascertain the condition of the West mine, met and turned back twenty or thirty men, miners and mule drivers, who had entered the mine, and it was not until after that occurrance that a man was stationed at the drift-mouth to warn people of the danger.

Plaintiff's intestate had no knowledge of these fires. He had only been in the service of the company three or four months, and his work had been confined to a section of the mine known as Gray heading, two and a quarter miles from the drift-mouth of the main entry. Sprengoski worked at Fort Wayne, which is a shorter distance from the drift-mouth than Gray heading, and the Rukas brothers parted with him at that point. When that part of the mine began to fill with gas and smoke, he escaped through an opening near his place of work with which

he was familiar, while the Rukases sought safety in flight along the route by which they had entered, the only one known to them, but were overcome before reaching the outside and perished.

As observed, the officials of the company learned of the condition of affairs at the mines soon after the first fire was discovered; and after extinguishing the fire at the fan, they had been in vain attempting to control the fire in the Baby mine for some two hours before plaintiff's intestate and his companions entered the West mine. They knew that several hundred men composed the day shift in that mine, and that their hours of labor commenced between six and seven o'clock. They also knew, or in the exercise of ordinary care ought to have known, of the dangerous consequences likely to result from an uncontrolable fire in a gaseous coal mine to an adjoining mine on a higher level, and connected by cross-cuts with the burning mine. Such conditions imperatively demanded prompt measures for the safety of employees.

The duty of the defendant to warn plaintiff's intestate of the changed conditions and the certain peril to which he would be exposed by continuing to work in the mine is corollary to the primary duty of exercising ordinary care to furnish him a reasonably safe place in which to work in the first instance. The main principle has repeatedly received the sanction of this court, and the subordinate proposition seems also to be well settled.

The doctrine is stated as follows, by Sherman & Redfield: "The master must, therefore, give warning to his servants of all perils to which they will be exposed, of which he is, or ought to be, aware, other than such as they should, in the exercise of ordinary care, have foreseen as necessarily incidental to the business, in the natural and ordinary course of affairs; though more than this is not required of him." 1 Shearman & Red. on Neg. (5th Ed.), sec. 203.

In note 5 to that section, it is said: "An employer is bound to give notice of latent dangers among which the employee is required to work, and of which the employer has knowledge."

See also 1 Labatt on Master & Servant, sec. 240; *Galveston, &c. R. v. Garrett* (Tex.), 13 S. W. 62, 15 Am. St. Rep. 781; *Parkhurst* v. *Johnson* (Mich.), 15 N. W. 107, 45 Am. St. Rep. 28; *Smith* v. *Peninsular Car Works* (Mich.), 27 N. W. 662, 1 Am. St. Rep. 542; *McDonald* v. *Chicago, &c. R. Co.* (Minn.), 43 N. W. 380, 16 Am. St. Rep. 711; *Johnson* v. *First Nat. Bank* (Wis.), 48 N. W. 712, 24 Am. St. Rep. 722.

In *Michaels* v. *Roanoke Mach. Wks.*, 90 Va. 492, 19 S. E. 261, 44 Am. St. 927, this court says: "Accordingly, the servant has a right to assume, when placed in a situation of danger, where engrossing duties are required of him, that the master will not, without proper warning, subject him to other perils unknown to him, and from which the work exacted necessarily distracts his attention."

The questions of negligence and contributory negligence were submitted to the jury upon correct instructions, and viewing the case from the standpoint of a demurrer to the evidence, the evidence is quite sufficient to establish the fact that the negligence of the defendant was the proximate and efficient cause of the death of plaintiff's intestate.

The judgment of the Circuit Court is without error, and must be affirmed.

*Affirmed.*